UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiff,<br><br>    v.<br><br>NISHAD SINGH,<br><br>                    Defendant. | Case No. 23-CV-1684<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

## I.     SUMMARY

1.     Nishad Singh ("Singh" or "Defendant") was an early and central employee of both the centralized digital asset exchange doing business as FTX.com ("FTX") and its sister-company, Alameda Research LLC ("Alameda"), a digital asset trading and investment firm.  As a lead and supervising engineer for FTX, Alameda and other entities operated by Samuel Bankman-Fried ("Bankman-Fried"), Singh knew of, maintained and/or had access to certain code features that enabled Alameda to impermissibly access and use over $8 billion in FTX customer assets.

2.     On December 21, 2022, the CFTC filed an Amended Complaint charging Bankman-Fried, FTX, Alameda and others with a scheme to defraud, among other charges.  *CFTC v. Bankman-Fried et al.*, Case No. 1:22-cv-10503-PKC (S.D.N.Y.).  Singh participated in the same scheme to defraud, through the conduct set forth herein.

3.     Up until the abrupt collapse of FTX and Alameda in early November 2022 following public revelation of Alameda's misappropriation of FTX customer funds, Singh was the

Director of Engineering of FTX and Chief Engineer of FTX US.  Singh also supervised the software development teams for FTX, FTX US and Alameda, and was responsible for creating or maintaining various features in the underlying code for FTX that, together with other changes, granted Alameda numerous undisclosed privileges and advantages on FTX, including the ability to withdraw FTX customer assets.  Singh reported directly to Bankman-Fried, who was the controlling majority owner of the FTX, Alameda and FTX US constellation of companies.  The companies under Bankman-Fried's control operated as a single, integrated common enterprise, referred to herein as the "FTX Enterprise."  Singh remained a key executive of the FTX Enterprise until the time of its collapse and bankruptcy filing on November 11, 2022.

4.      Beginning no later than May 2019 and continuing through at least November 11, 2022 (the "Relevant Period"), unbeknownst to all but a small circle of insiders including Singh, FTX customers assets, including fiat currency and digital assets such as bitcoin (BTC), ether (ETH) and stablecoins such as tether (USDT), each a commodity in interstate commerce, that were intended to be used for trading or custodied on FTX, were regularly accepted, held by and/or misappropriated by Alameda for its own use.

5.      At Bankman-Fried's direction, Singh and others created various features in the underlying code for FTX that, together, allowed Alameda to maintain an essentially unlimited line of credit on FTX.  Singh and others also created other exceptions to FTX's standard processes that allowed Alameda to have unfair advantages when transacting on the platform, such as exemptions from the platform's publicly-touted auto-liquidation risk management process.

6.      During the Relevant Period, relying on the code features created by Singh and others, Alameda used FTX assets, including customer assets, to trade on other digital asset exchanges and to fund a variety of high-risk digital asset industry investments.

7.     During the Relevant Period, through a web of subsidiaries, affiliates and other related entities collectively constituting the FTX Enterprise, Singh and other FTX executives misappropriated customer assets for their own use and benefit.  Singh personally misappropriated assets, including FTX customer assets, including through a series of poorly-documented "loans" from Alameda and other improper withdrawals from FTX.  Singh used these assets, at least in part, for his own purposes, including purchasing residential property and making political donations. This unauthorized use of FTX customer assets was not disclosed to or known by FTX customers. Singh took loans from Alameda and withdrawals from FTX even after he knew or should have known that the source of those assets derived, at least in part, from FTX customer assets.

8.     Despite this, FTX widely represented, in its Terms of Service and elsewhere, that customers were the owners of all assets in their accounts, had control over the assets at all times, and that those assets were appropriately safeguarded and segregated from FTX's own assets.  The FTX Enterprise also widely represented that FTX's operations were effectively separated and walled-off from those of Alameda.  On information and belief, Singh knew that these types of representations were being made by and on behalf of the FTX Enterprise and that such representations were false.  Singh nevertheless engaged in willful acts, as described herein, that he knew were directly contrary to such representations.

9.     Through this conduct and the conduct further described herein, Singh committed commodities fraud in violation of Section 6(c)(1) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. §180.1(a) (2022).

10.     In addition to being directly liable for his violations of the Act as set forth herein, Singh also, through this conduct and conduct further described herein, willfully aided and abetted

the same violations of the Act committed by FTX, Alameda and Bankman-Fried.  Therefore, pursuant to Section 13(a) of the Act, 7 U.S.C. §13c (a), Singh is responsible as a principal for their violations of Section 6(c)(1) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a), 17 C.F.R. §180.1(a) (2022).

11.     Unless restrained and enjoined by this Court, Singh is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

12.     Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Singh's unlawful acts and practices and to compel his compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the Act, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

14.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Singh transacted business in the Southern District of New York and engaged in certain acts and practices in violation of the Act and Regulations within this District.

### III.    PARTIES

#### A.    The CFTC

15.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

#### B.    Defendant

16.     **Nishad Singh** is a United States citizen who has resided in various locations during the Relevant Period and currently resides in the United States.  Singh was an executive and shareholder of FTX during the Relevant Period, and was also a co-founder and shareholder FTX US.  Singh served as Director of Engineering of FTX and FTX US and also had various roles and responsibilities relating to Alameda.  Singh resided in and/or performed work for the FTX Enterprise in various locations during the Relevant Period, including in the United States and in this District.  He has never been registered with the Commission in any capacity.

#### C.    Other Relevant Individuals and Entities

17.     **Samuel Bankman-Fried** ("Bankman-Fried") is a United States citizen who currently resides in the United States.  Bankman-Fried is the founder and majority owner of the FTX Enterprise, including FTX and Alameda.  Bankman-Fried resided in and performed work for FTX and Alameda in various locations during the Relevant Period, including in the United States.  On December 9, 2022, Bankman-Fried was charged with conspiracy to commit commodities fraud, among other criminal charges, in this District.  *United States v. Bankman-Fried*, Case No. 22-cr-673 (S.D.N.Y.).  He has never been registered with the Commission in any capacity.

18.     **FTX Trading Ltd.** ("FTX Trading") is a corporation registered in Antigua and Barbuda.  During the Relevant Period, FTX Trading Ltd. along with its subsidiaries and affiliate entities, including without limitation FTX Digital Markets Ltd. ("FDM"), located in the Bahamas,

collectively did business as "FTX.com" or "FTX" and operated the digital asset trading exchange during the Relevant Period.  FTX had numerous employees, including key personnel, that were based in and perform work from the United States, including in this District.  FTX had regularly engaged in advertising and promotional activities in the United States. None of the FTX entities has ever been registered with the Commission in any capacity.  FTX is currently in Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for the District of Delaware.

19.    **Alameda Research LLC** ("Alameda") is a Delaware limited liability company. During the Relevant Period, Alameda, along with its parent, subsidiary and affiliate entities, including without limitation Alameda Research Bahamas Ltd. and  Alameda Research Ltd (BVI), collectively operated and did business as the digital asset trading and investment firm "Alameda." Alameda was founded in, maintained offices in and had numerous employees, including key personnel, that were based in and performed work from the United States during the Relevant Period.  Alameda has never been registered with the Commission in any capacity.  Alameda is currently in Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for the District of Delaware.

20.    **Caroline Ellison** ("Ellison") is a United States citizen who currently resides in the United States.  Beginning in October 2021, Ellison served as a CEO of Alameda, specifically under appointment as co-CEO and later sole CEO of Alameda Research Bahamas Ltd. and Alameda Research Ltd (BVI), both operating entities doing business as Alameda.  On December 19, 2022, Ellison pled guilty to conspiracy to commit commodities fraud, among other criminal charges, in this District.  *United States v. Caroline Ellison*, Case No. 22-cr-673 (S.D.N.Y.).  She has never been registered with the Commission in any capacity.

21.     **Zixiao "Gary" Wang** ("Wang") is a United States citizen who currently resides in the United States.  He is a co-founder and co-owner of FTX and Alameda.  Wang served as the Chief Technology Officer  ("CTO") of FTX and also performed key functions for Alameda during the Relevant Period.  Wang resided in and performed work for FTX and Alameda in various locations during the Relevant Period, including in the United States.  On December 19, 2022, Wang pled guilty to conspiracy to commit commodities fraud, among other criminal charges, in this District.  *United States v. Zixiao (Gary) Wang*, Case No. 22-cr-673 (S.D.N.Y.).  He has never been registered with the Commission in any capacity.

22.     During the Relevant Period, FTX and Alameda, together with other entities under the majority ownership and control of Bankman-Fried operated as a single, integrated common enterprise under the ultimate authority of Bankman-Fried as their mutual owner, and identified herein as the FTX Enterprise.  Singh and others aided Bankman-Fried in the operation and management of the FTX Enterprise, including by exercising discretion over firing, hiring and certain operational decisions.  The FTX Enterprise failed to observe corporate formalities, including failure to segregate assets, operations, resources and personnel, or to properly document intercompany transfers of assets and other resources.  The entities regularly shared office space, systems, accounts and communications channels.  Assets flowed freely between the FTX Enterprise entities, often without documentation or effective tracking.

## IV.     STATUTORY BACKGROUND AND LEGAL FRAMEWORK

23.     The purpose of the Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all

transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

24.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as bitcoin (BTC), ether (ETH) and stablecoins such as tether (USDT), which are digital representations of value that function as mediums of exchange, units of account and/or stores of value.  Digital assets such as including bitcoin (BTC), ether (ETH), stablecoins such as tether (USDT) and others are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

25.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital asset commodities, including bitcoin and ether futures and options, by boards of trade registered with the Commission, including the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("CBOE").

26.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

27.     CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a), promulgated pursuant to the authority in CEA Section 6(c)(1), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

    (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; or

    (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or

    (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person

28.    Section 13(a) of the Act, 7 U.S.C. § 13c(a), establishes responsibility as a principal for any person who willfully aids, abets, counsels, commands, induces or procures violations of the Act, or that acts in combination or concert with another person who commits violations of the Act. Specifically, Section 13(a) states that:

> Any person who commits or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

## V.    FACTS

### A.    Founding of Alameda and the FTX Exchange

29.    In 2017, Singh, a personal friend and classmate of Bankman-Fried's younger brother, was working full-time as a software engineer at a tech company in California. Shortly after founding Alameda, Bankman-Fried recruited Singh, and he began working nights and weekends for Alameda. Singh ultimately resigned his other employment to join Alameda full-time in December 2017 as a software engineer. He later became the engineering manager and then head of engineering at Alameda, supervising all developers except Wang.

30.    Initially, Alameda primarily engaged in high-frequency digital asset arbitrage trading across a large variety of digital asset exchanges, including certain exchanges operating in

the United States.  Alameda also acted as a "market maker" and "liquidity provider," essentially serving as an always-available counterparty to traders in certain digital asset markets.  Alameda subsequently expanded its activities into a number of new digital asset business models, including making large equity investments in various companies in the digital asset industry and taking large directional positions in various digital asset markets.  All of this activity was frequently facilitated through large loans Alameda obtained from digital asset lending platforms and other sources, which enabled Alameda to increase the size and variety of its digital asset industry positions.

31.     Simultaneously with operating Alameda, Bankman-Fried and Wang, later with Singh's assistance, also began building the digital asset exchange that would ultimately become FTX.  In early 2019, Bankman-Fried, Wang and others moved to Hong Kong to finalize and launch the FTX platform to the public.  Although Singh contributed to building FTX, he initially remained in California and supervised the Alameda engineering team.  In or around May 2019, when the FTX.com website was released to the public, Singh transitioned to working primarily for FTX.  Singh initially worked for FTX remotely from California, then relocated to Hong Kong in early 2020.  Singh became the Director of Engineering of FTX, and in that capacity was responsible for supervising all FTX developers other than Wang, who was the FTX Chief Technology Officer.  Singh, Wang and developers working under them were primarily responsible for the design and implementation of the code underlying FTX.com (i.e. the computer programming instructions that direct the function of the FTX platform).  Singh was a senior executive of FTX and reported directly to Bankman-Fried.

32.     FTX offered trading in a large variety of digital assets, including digital asset commodities such as bitcoin, ether, stablecoins such as tether and others.  FTX operated primarily as a derivatives exchange and offered trading in various types of options, futures, swaps, "perpetual

futures" and other digital asset commodity derivative products.  FTX allowed customers to place buy (long) and sell (short) orders in an electronic order book and matched customer orders via its "trading engine" or "matching engine."  FTX also offered a number of additional services related to the trading of digital asset products.  For example, FTX operated a peer-to-peer (P2P) margin lending program where customers could offer margined offerings to one another.

33.     Customers could access the FTX platform through the FTX.com website, through a mobile application and through an Application Programming Interface (API).  FTX also offered an off-exchange "over the counter" (OTC) portal that enabled customers to connect and request quotes for spot digital assets and trade directly, rather than placing orders on a central limit order book.  Singh, Wang and other developers working under Singh's supervision were responsible for the design and implementation of the code for the FTX API and OTC portal.

34.     FTX also relied on Alameda resources, assets and personnel to carry out a number of core functions for the FTX platform, including creating liquid submarkets for all of the products offered on FTX, maintaining an appropriate balance of various digital assets on the exchange and supporting the "peer to peer" margin lending program.  Singh was the ultimate supervisor of the Alameda developers who had responsibilities related to those functions.  Alameda likewise relied on various FTX resources, assets and personnel, including Singh, Wang and FTX developers reporting to Singh for a number of functions.

35.     FTX grew quickly.  By June 2019, for example, just months after its launch, according to FTX, the daily volume of futures trading on FTX often exceeded $100 million. Beginning no later than 2020, FTX was consistently ranked as one of largest digital asset exchanges in the world by trading volume.  In 2021, according to FTX, FTX entities held

approximately $15 billion in assets on their platforms, accounted for approximately 10% of global digital asset volumes and transacted $16 billion of volume per day.

36.     Because of the perception of potential conflicts of interest between FTX and Alameda, FTX Enterprise executives and employees, including Singh, understood that it was important to present a public perception that there was strong separation between Alameda and FTX.  Bankman-Fried and others reinforced a separate spheres narrative in their public statements.

37.     On information and belief, Singh knew that these types of representations were being made by and on behalf of the FTX Enterprise and that such representations were false.  He nevertheless engaged in willful acts that he knew were contrary to such representations.  Throughout the Relevant Period, Alameda and FTX continued to share office space, first in Berkeley, California and later in Hong Kong and the Bahamas.  They also shared key personnel, technology and hardware, intellectual property and other resources, including developer personnel and resources provided and/or supervised by Singh.  Singh and other executives at Alameda and FTX also had widespread access to many of each other's systems and/or accounts.

38.     In January 2020, Singh, Bankman-Fried and Wang established a separate group of entities operating a digital asset exchange specifically for U.S. persons.  These entities collectively did business as "FTX US."  The FTX US entities were incorporated primarily in the State of Delaware, including under the registered name "West Realm Shires Inc.," and also held various registrations, including as a licensed Money Transmitter under the laws of the State of South Dakota.  FTX US offered trading to U.S. persons in a variety of digital assets, including, but not limited to, spot digital asset commodities.  Singh was the Chief Engineer of FTX US, and was also represented to be the Chief Security Officer for FTX US in certain official paperwork and correspondence.

39.     Singh, Bankman-Fried and Wang came to be known internally within the FTX Enterprise as "the founders."  FTX also publicly represented, including in submission to U.S. government departments and/or agencies, that "The FTX group of companies (FTX Group or FTX) was established by three Americans, Samuel Bankman-Fried, Gary Wang and Nishad Singh, with international operations commencing in May 2019 and the U.S. exchange starting in 2020."

40.     During the Relevant Period, FTX purported to block U.S.-based customers from using its exchange to transact in digital asset products and to instead direct those U.S. customers to transact exclusively through the FTX US and FTX US Derivatives entities.  On information and belief, some U.S. persons and entities were able to use FTX to transact in digital assets, including digital asset commodity products, futures, options, swaps, " perpetual futures" and derivatives.

### B.      FTX and Alameda Commingled, Mishandled and Misappropriated FTX Customer Assets from the Moment of FTX's Launch

41.     At the time FTX was launched, it did not establish the requisite bank accounts to accept and hold customer assets.  Instead, customers seeking to deposit "fiat" currency (i.e. traditional government-issued currency) into their FTX accounts were directed to wire their fiat deposits to bank accounts that were owned and controlled by Alameda.  Some of those bank accounts were opened in the name of an entity called North Dimension, a Delaware-registered wholly-owned subsidiary of Alameda that, on information and belief, deliberately did not have a name that was readily-identifiable with Alameda.  Certain of these bank accounts were located and based in the United States.

42.     Once received, FTX customer assets were not segregated from Alameda assets or placed into accounts designated as being "for the benefit of" (FBO) FTX customers.  Initially, when FTX customer assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX customer accounts with the corresponding amount of fiat currency on FTX

internal ledger system.  During the Relevant Period, customers accessing their FTX accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX accounts, even though the fiat deposits actually remained in Alameda-controlled bank accounts.  During the Relevant Period, Singh knew of this process and of access Alameda was granted to FTX's systems that enabled Alameda's continued and undisclosed holding and use of FTX customer funds.

43.     FTX allowed customers to deposit their assets in one denomination and withdraw their assets in another denomination that was treated as equivalent.  For example, a customer could deposit dollars and withdraw USDC or tether (USDT), or vice versa.  Alameda was responsible for facilitating this FTX feature.  Alameda personnel thereby had the ability to access and withdraw assets, including customer assets, stored in FTX digital asset "hot" (i.e. online) wallets to make the digital asset exchanges necessary to support this functionality.  Singh knew of and willfully maintained certain features in the FTX code related to these functionalities.  Alameda's role in this process and the corresponding access to customer accounts granted to Alameda to facilitate this were not disclosed to or known by FTX customers.

44.     The Alameda-owned bank accounts holding FTX customer fiat assets were collectively reflected on FTX's internal ledger systems as the "fiat@ftx.com" account.  During the Relevant Period, this account held a liability of as much as $8 billion in FTX customer assets.  Often, those assets were not maintained as bank deposits or converted to stablecoins in FTX-controlled wallets, but rather diverted to and used by Alameda.  Even after FTX opened its own FBO bank accounts, previously transferred FTX customer assets were not moved into FTX's bank accounts and instead continued to be reflected in the "fiat@ftx.com" account.  In addition, at least some FTX customers continued to send fiat deposits to Alameda-owned accounts.  Singh willfully

designed, coded, implemented, facilitated, maintained and/or was responsible for certain components of these functionalities.   During the Relevant Period, Singh knew that this "fiat@ftx.com" liability consisted of FTX customer assets.

45.     In approximately mid-2022, Singh and other FTX employees who reported to Singh undertook a project to segregate, account for and reconcile the "moral balances" between comingled FTX assets—including customer assets in the "fiat@ftx.com" account—and Alameda's own assets.  After several months of effort, this project failed, due in part to a lack of adequate documentation of the sources of funds contained in various accounts.  The failure of this project exemplified the depth of the practically irreconcilable comingling of FTX customer assets with FTX and Alameda's own assets, and put Singh and others on clear notice of the same.

46.     Consistently from the launch of FTX and throughout the Relevant Period, Alameda accessed and used FTX customer assets for Alameda's own operations and activities, including to fund its trading, investment and borrowing/lending activities.  Alameda's use of FTX customer assets included both customer fiat deposits that were sent to Alameda-owned bank accounts and customer digital asset deposits and holdings that Alameda accessed via the essentially unbounded withdrawal capabilities of its FTX account.  During the Relevant Period, Singh knew that Alameda accessed and used FTX customer assets for undisclosed purposes and knew of features in the FTX code that enabled these practices.  Singh willfully maintained and/or was responsible for at least certain components of code related to these functionalities.

47.     Singh was aware of business justifications underlying at least some of Alameda's undisclosed access to FTX customer assets.  During the Relevant Period, Singh also gradually became aware that these same functionalities enabled and resulted in the misappropriation of FTX customer assets.  Singh also directly participated in the misappropriation.  Beginning no later than

mid-2022, Singh also gradually became aware that Alameda's liability to FTX customers was one that Alameda and FTX were not able to repay. In or around September 2022, Singh participated in conversations with Bankman-Fried and other FTX and Alameda senior management about how they could fill the large hole in FTX's balance sheet.

48.     Alameda's access to and use of FTX customer assets was not authorized by or disclosed to FTX customers. To the contrary, for example, FTX's Terms of Service provide that customers retain title and control of their assets, and that "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading." Internal policy documents recognized the FTX Entities' "responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds." Furthermore, in public venues such as Twitter and when providing information to the U.S. Congress, the CFTC and/or other federal and state government agencies, and to investors, representatives of the FTX Enterprise including Bankman-Fried consistently and repeatedly reiterated, in a variety of contexts, that customer assets were properly segregated and custodied by FTX at all times.

49.     On information and belief, during the Relevant Period, Singh knew that these and other representations that FTX carefully segregated and protected customer assets were false, and he engaged in willful acts that he knew were contrary to to of such representations. For example, during the Relevant Period, Singh knew that Alameda and FTX commingled assets and freely used FTX customer assets. Singh also gradually became aware that Alameda used FTX customer assets as capital to deploy in their own trading and investment activities. While Singh had earlier been under the impression that Alameda would be able to return and repay the misappropriated FTX customer assets when customers sought to make withdrawals, he later became aware that Alameda's misappropriation had greatly exceeded its ability to repay.

50.     Singh and other FTX executives used FTX assets, including FTX customer assets, for a variety of personal expenditures, including to purchase property, make political donations and for other personal uses.  Singh personally took millions in poorly documented "loans" and other withdrawals from Alameda and FTX, including in the fall of 2022—after he knew that Alameda had caused a significant shortfall of FTX customer assets that  FTX and Alameda could not repay.  This included at least one leveraged withdrawal collateralized by digital assets that Singh knew or should have known would plummet in value once the misappropriation of FTX customer assets became public.

### C.     Alameda's Special Privileges and Functions on FTX

51.     From the launch of FTX, Alameda operated as a primary market maker on FTX and acted as an always-available buyer and seller of digital assets in order to provide sufficient liquidity and an available trading counterparty to FTX customers.  This included functioning as a primary market maker for more low volume and/or illiquid digital assets.  In that capacity, unlike other market makers on FTX, Alameda was permitted to "sell" such digital assets to an FTX customer even if it did not at that time have ownership of the digital assets it was purportedly selling, which was known internally at FTX and Alameda as a "long tail" sale.  In such a case, FTX customer accounts were credited as owning that digital asset at the time of the transaction, even if there was no corresponding digital asset for their benefit in FTX's wallets.  FTX customers were not made aware of this.

52.     Alameda performed a number of other undisclosed core functions on behalf of FTX throughout the Relevant Period, including maintaining a balance of various digital assets, including but not limited to stablecoins, to be available to trade on FTX.  FTX customers were not made aware that this function was performed by Alameda rather than FTX, or that this function

required certain undisclosed permissions for Alameda's account on FTX that could be exploited for other purposes, including misappropriation of FTX customer assets.

53.     Alameda also had an undisclosed role with respect to the functionality of FTX's backstop liquidity provider ("BLP") program.  In marketing materials and in communications with federal regulators and others, FTX touted its auto-liquidation risk management engine, cross-margin functionality and BLP program as unique features of FTX that more effectively limited and managed risk on the exchange.  Singh, Wang and developers working with them under Singh's supervision were primarily responsible for the design and implementation of the code underlying these features of FTX.  Alameda was a leading participant in the BLP program.

54.     On certain occasions during the Relevant Period, Singh directly and willfully implemented changes for the automated "delevering" risk management engine and BLP program that had the effect of overriding public representations made by or on behalf of FTX about the operation those features.  For example, in May 2022, Singh "reprice[d] some liquidations for some users," including by "changing the price of user's fills" for certain past liquidation events for which Alameda served as the BLP.  One goal of this and similar actions Singh undertook was to show "insurance fund losses to be less."   On information and belief, Singh knew that the changes introduced by his code were contradictory to public representations about the effectiveness and functionality of FTX's risk management programs and nevertheless engaged in willful acts that he knew were contrary to such representations.

55.     Alameda enjoyed certain essential and undisclosed benefits and privileges on FTX throughout the Relevant Period.  These advantages were programmed into the code for FTX by Singh, Wang and other developers supervised by Singh, typically at the direction of Bankman-Fried.  For one, Alameda was exempt from FTX's "auto-liquidation" risk engine functions, which

would automatically liquidate (sell) a customer's open position when their "Maintenance Margin Fraction" fell below a certain determined level.  Customers who took on too much leverage or risk on FTX would be auto-liquidated by the exchange.  Alameda was exempt from this—it could not be liquidated on FTX under any condition.  Alameda's exemptions from the liquidation protocol were hard-coded into FTX's system through various, sometimes redundant means, some of which were willfully coded and implemented by Singh.

56.    Alameda also enjoyed order execution timing privileges for its transactions on FTX during the Relevant Period.  Singh willfully designed, coded, implemented, facilitated, maintained and/or was responsible for these functionalities.  On information and belief, Singh also knew that these advantages were not publicly disclosed during the Relevant Period and nevertheless engaged in willful acts to further Alameda's undisclosed advantages.

57.    Alameda's account on FTX had a special designation in the FTX code throughout the Relevant Period, labeled as an "allow negative flag," which allowed Alameda to execute a transaction even if it did not have the assets available in its account to do so.  Singh originally created the "allow negative" functionality and a related "can withdraw below borrow" functionality in the FTX code in 2019 and, on information and belief, these functionalities were later utilized by other FTX executives to extend this functionality to Alameda's trading accounts.  In August 2020, Singh also created a feature in the FTX code that would send an alert when Alameda's account would otherwise be subject to liquidation pursuant to FTX's risk management function in lieu of proceeding with liquidation.  This was intended as a backstop to enable Alameda to transfer assets to avoid liquidation.  Contemporaneously with implementing this change, Singh alerted Wang that he had created this feature in the code.  Wang responded to Singh that liquidation of Alameda was unlikely to ever occur and that this feature was therefore not likely to be triggered.

Alameda's borrowing limit on FTX was gradually raised over time and was ultimately raised to approximately $65 billion.  Alameda's borrowed assets could also be withdrawn from FTX.  Singh willfully designed, coded, implemented, facilitated, maintained and/or was responsible for various functionalities that ultimately enabled Alameda to withdraw unlimited assets from FTX to put towards its off-platform activities.

58.    Alameda also engaged in various undisclosed activities in order to benefit FTX during the Relevant Period.  Some such activities created a false impression that FTX had high-performing automated functionalities, when in fact those functionalities were being executed and/or supported by Alameda.  Singh willfully engaged in acts that he knew were contrary to of such implicit and explicit understandings and representations.  For example, as Singh explained in an internal communication, "[A]lameda . . . and a few other [market makers] have the ability to market make on markets pre-listing (so that when we go live they have real orderbooks)."  Singh willfully designed, coded, implemented, facilitated, maintained and/or was responsible for these functionalities.  FTX customers were not made aware of Alameda's role in such functionalities.

### D.    Alameda Escalated its Misappropriation of Customer Assets in 2022

59.    In approximately May and/or June 2022, Alameda was subject to a large number of margin calls and loan recalls as a result of certain digital asset market events.  It did not have sufficient liquid assets to service its loans.  Instead, Alameda greatly increased its usage of FTX customer assets to meet its external debt obligations.  Alameda was able to rely on its undisclosed ordinary-course access to FTX credit and customer assets to facilitate these large withdrawals, which were several billion dollars in notional value.  By approximately mid-2022, FTX's internal ledgers reflected that Alameda's fiat liability to FTX totaled approximately $8 billion, a staggering

amount that exceeded FTX total lifetime revenue.  Bankman-Fried had acknowledged this large outstanding balance to a small group of key personnel of FTX and Alameda, including Singh.

60.    During this time, Singh became overtly aware that Alameda's liability to FTX customers was one that Alameda and FTX were not able to repay.  For example: in approximately June 2022, Singh participated in conversations with Bankman-Fried, Ellison and others where the decision was made that Alameda would use large quantities of FTX assets, which included comingled FTX customer assets, to cover Alameda's debt obligations; in approximately September 2022, Singh participated in conversations about how—and whether—FTX and Alameda could repay those obligations; also in September 2022, Singh also participated in conversations with Bankman-Fried and others about whether Alameda should be shut down in light of its significant losses.

61.    At approximately this same time in or around mid-2022, Singh reallocated Alameda's approximately $8 billion in liabilities to a customer account on FTX's systems that Bankman-Fried would later refer to as "our Korean friend's account" and/or "the weird Korean account."  He was asked to do this, at least in part, to prevent Alameda from paying interest on its large outstanding balance.  This account was designated as a sub-account of Alameda's main account, but unlike other Alameda sub-accounts on FTX, it was not opened under an "@alameda-research.com" identifier and was not otherwise readily identifiable as being an Alameda-associated account.  The system notes associated with the account described it as "FTX fiat old." The same type of "allow negative flag" and exemption from liquidation characteristics were carried over to the so-called Korean account.  After this transfer, it was no longer readily apparent on FTX's ledgers that Alameda had an $8 billion negative balance on its FTX account.  Bankman-Fried and others were aware of this transfer at the time it occurred.

### E.      November 2022 Collapse of FTX and Alameda

62.      On November 2, 2022, the online digital asset news publication Coindesk.com published an article titled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet," and subtitled: "Alameda had $14.6 billion of assets as of June 30, according to a private document CoinDesk reviewed. Much of it is the FTT token issued by FTX, another Bankman-Fried company."  This article reported on a purported leaked Alameda balance sheet that showed that, at least as of June 30, 2022, an extremely high portion of Alameda's $14.6 billion in assets consisted of the FTT token.

63.      On November 6, 2022, Singh and others discussed ways to respond to the increasing "FUD" (fear, uncertainty and doubt) resulting from the leaked Alameda balance sheet. Singh and others offered proposed responses that Ellison could post on Twitter.  Ellison thereafter posted two tweets that indicated that the balance sheet was not a complete statement of Alameda's assets and positions.

64.      On the evening of November 6, as they monitored and reacted to the movements in FTT prices and the contagion effects on the digital asset market more broadly, Bankman-Fried, Ellison and another Alameda executive expressed surprise that these events had not had a larger negative impact on the prices of bitcoin, saying in a chat message:

>     [Alameda executive 1]: "I'm surprised BTC isnt down more"
>
>     Ellison: "me too"
>
>     Bankman-Fried: "yea me 3"

At this time, bitcoin market prices, including on U.S. exchanges, had indeed begun to decline, likely as a direct or indirect result of the events described herein.

65.      At the same time, an increasing number of FTX customers began requesting to withdraw their assets from the exchange.  FTX personnel, including Singh and developers working

under his direction, initially managed to keep FTX's systems operating quickly enough to keep up with withdrawals, but soon fell behind.

66.     By late in the day on November 7, it was apparent to FTX executives, including Singh, that FTX did not have sufficient assets to cover all customer withdrawals, and that there were not sufficient assets held in various FTX accounts to cover all customer deposit obligations.

67.     Singh, Bankman-Fried, Ellison and other key personnel of FTX and Alameda acknowledged internally that this shortfall was not merely a matter of having sufficient liquid assets on hand to cover customer withdrawals in the short term; rather, FTX customer assets were irrevocably lost because Alameda had misappropriated them.

68.     That same day, the Alameda traders who had been liquidating Alameda's open positions to free up capital for FTT buybacks were directed to instead sell everything that could be sold quickly from Alameda's holdings, to maximize open lines of credit or any other available sources of capital, and generally do anything possible to quickly obtain billions of dollars in capital to send to FTX.

69.     On or about November 7, FTX US executives asked Singh and Wang to evaluate the solvency of FTX US.  They were readily able to carry out this request because they both had access to and oversight of the FTX US (but not FTX US Derivatives) code, database and ledgers in the ordinary course of their duties.  With Singh's assistance, Wang ultimately identified a shortfall on FTX US that FTX executives did not understand and were unable to fully quantify. Bankman-Fried thereafter directed Alameda traders to prioritize meeting FTX US capital requirements and to send excess capital to FTX US.  Alameda sent in excess of $185 million to FTX US to help fill its shortfall.  Ellison later attributed this shortfall, at least in part, to Alameda's margin trading position on FTX US.

70.     In direct contradiction of this internal series of events, on November 7, in public statements and various Twitter messages, Bankman-Fried and others acting on behalf of FTX continued to portray the shortfall that was causing customers to be unable to withdraw their assets as merely a liquidity problem.  They affirmatively, and falsely, stated that FTX continued to be solvent and that all customer deposits were safe. For example, Bankman Fried tweeted:



71.     This and other iterations of proposed tweets by Bankman-Fried were debated and rewritten among a small group of FTX executives and other of Bankman-Fried's confidants, including in a message chat group called "PR Super Sensitive," which included Singh.  Several individuals, including Singh, expressed concerns in chat messages and/or in-person conversations that Bankman-Fried's tweet was inaccurate and/or misleading.

72.     Prior to sending these and similar tweets, on the evening of November 6, Bankman-Fried said to Singh in a one-on-one chat message "I think Im' [*sic.*] going to tweet btw unless you really thin [*sic.*] it's bad."  Singh did not respond to this question.  Instead, several hours later, Singh sent Bankman-Fried a message asking for Bankman-Fried's authorization to "unwind" and "get rid of" the loans he owed to the companies, saying "one thing that'd seriously help me is if I didn't have debts."  Singh suggested a backdated transaction to "sell ftt or srm earlier in 2022" as one solution.  Bankman-Fried responded "I think that's probably fine."  Singh later also asked another other FTX executive about the possibility of erasing his loan obligations.  Singh did not ultimately proceed with any such transaction.

73.     At the same time as Bankman-Fried was making public assurances, he and numerous others acting on behalf of FTX were also reaching out to as many sources of funding as possible in an attempt to quickly raise several billion dollars to cover the shortfall in customer assets.  As the calculation of the amount of the shortfall grew from $1-2 billion, to $2-4 billion, to as much as $8 billion, the number of viable potential rescue options diminished.  Numerous parties declined to bail out FTX regardless of the favorable terms being offered.

74.     At approximately this same time, Bankman-Fried prepared or caused to be prepared a balance sheet to be shared with prospective investors showing the assets and liabilities of the companies.  That balance sheet was unorthodox in a number of respects.  Most notably, the balance sheet included an $8 billion negative balance from a "hidden, poorly internally labeled 'fiat@' account."

75.     The existence and nature of the "fiat@" account was in fact known to Bankman-Fried, Singh and others.  For example, just a few months prior, with Bankman-Fried's knowledge,

Singh had redirected the "fiat@" account on the FTX system by transferring the "fiat@" balance

to the "Korean friend" sub-account of Alameda with the notation "FTX fiat old."

76.     On the morning of November 9, 2022 at approximately 10 AM ET, Ellison held an

"all-hands" meeting with Alameda staff.  In that meeting, Ellison acknowledged that earlier that

year, she, Bankman-Fried and other individuals had decided to use FTX customer assets to pay

Alameda's debts, and that Singh and Wang knew of this.  She also explained that Alameda could

access user assets without requiring FTX's approval as the "structure" allowed Alameda to "go

negative in coins."  Most Alameda employees resigned shortly thereafter.  Singh did not attend

this meeting, but tendered his resignation on the same day.

77.     On November 10, 2022, FTX and FTX US halted all trading and withdrawals, and

Bankman-Fried announced that Alameda was being wound down.  Bankman-Fried also posted a

lengthy Twitter thread purporting to explain how he "f[***]ed up."

78.     On November 10, 2022, at approximately 4:00 am ET, Bankman-Fried signed a

document resigning his position as CEO of FTX and, as majority owner of all the FTX and

Alameda companies, authorizing the appointment of an independent CEO of the FTX Enterprise

and the filing of Chapter 11 bankruptcy proceedings.

79.     The next day, on November 11, 2022, 134 separate companies of the FTX

Enterprise simultaneously filed for Bankruptcy.  Those proceedings are ongoing and being jointly

administered in the U.S. Bankruptcy Court for the District of Delaware.

F.     **Impact of These Events on Digital Asset Commodity Futures Markets**

80.     The foregoing series of events had a significant, observable negative impact on

digital asset commodity markets. For example, between the release of the November 2, 2022

Coindesk article and the events of November 9, 2022, the price of bitcoin futures fell more than 23% to two-year low prices.

81.    Various data visualizations demonstrate a clear connection between the foregoing events and the price movement of digital asset commodities, including bitcoin and ether.

82.    The foregoing conduct by Singh in common enterprise with others caused, directly or in directly, significant negative price impact on the value of commodities in interstate commerce in the U.S., including bitcoin and ether spot and futures prices, as illustrated in the following three market data charts.

83.    The following chart is a visualization of the price movement of bitcoin and ether digital asset commodity spot and futures prices on various major exchanges at the time of the foregoing events. On information and belief, the significant price movement demonstrated in this chart is a result of the conduct described herein:



84.    The following chart is a visualization of the impact of various of the foregoing market events on bitcoin futures prices on the U.S. CME exchange, with several of the key foregoing events identified on the price and time line. On information and belief, the significant price movement demonstrated in this chart is a result of the conduct described herein:



85.    The following chart is a visualization of the impact of various of the foregoing market events on ether futures prices on the U.S. CME exchange, with several of the key foregoing events identified on the price and time line.  On information and belief, the significant price movement demonstrated in this chart is a result of the conduct described herein:



## VI. <u>VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS</u>

### COUNT I: FRAUD

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) and
Regulation 180.1(a)(1), (3), 17 C.F.R. 180.1(a)(1), (3) (2022)**

86.     The allegations set forth in paragraphs 1 through 85 are re-alleged and incorporated

herein by reference.

87.     During the Relevant Period, Defendant Singh, intentionally or recklessly, in

connection with any swap, or contract of sale or any commodity in interstate commerce, or contract

for future delivery on or subject to the rules of any registered entity, directly or indirectly: used or

employed, or attempted to use or employ, a scheme or artifice to defraud; and/or engaged in, or

attempted to engage in, acts, practices, or a course of business that operated or would operate as a

fraud or deceit on any person, including, but not limited to, FTX customers and/or other market participants.  Defendant Singh did so by taking "loans" from Alameda that he knew or should have known consisted, at least in part, of misappropriated FTX customer assets, as alleged in the foregoing paragraphs;

88.    As a result of the foregoing conduct, Singh misappropriated funds in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3).

89.    Each and every use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on any person, including FTX customers and/or other market participants, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3).

## COUNT II: AIDING AND ABETTING FRAUD COMMITTED BY FTX, ALAMEDA AND BANKMAN-FRIED

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) and Regulation 180.1(a)(1)–(3), 17 C.F.R. 180.1(a)(1)–(3) (2022)

90.    The allegations set forth in paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

91.    During the Relevant Period, by the conduct described above, Defendant Singh willfully aided, abetted, counseled, commanded, induced, procured and/or committed acts in combination or concert with FTX, Alameda and/or Bankman-Fried that constituted violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R.

§ 180.1(a)(1), (3).  Therefore, as a result of the foregoing conduct, pursuant to Section 13(a) of the Act, 7 U.S.C. §13c(a), Singh is liable for FTX, Alameda and Bankman-Fried's violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3).

92.     Each and every willful act engaged in by Singh in furtherance of the violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1)–(3) committed by FTX, Alameda and/or Bankman-Fried constitutes a separate and distinct violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) for which Singh is responsible as if he were principal under Section 13(a) of the Act.

## VII.   RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.     An order finding that Defendant Singh violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022).

B.     An order of permanent injunction prohibiting Singh from engaging in conduct described above, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022), or aiding and abetting such violations.

C.     An order of permanent injunction prohibiting Singh from directly or indirectly:

(i)  trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la(40));

(ii) entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital asset

commodities, as that term is described herein, for his own accounts or for any account in which he has a direct or indirect interest;

(iii) having any commodity interests or digital asset commodities, as that term is described herein, traded on his behalf;

(iv) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities, as that term is described herein;

(v) soliciting, receiving, or accepting any funds and/or assets from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities, as that term is described herein;

(vi) applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

(vii) acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Singh to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.    An order directing Singh to rescind, pursuant to such procedures as the Court may

order, all contracts and agreements, whether implied or express, entered into between, with, or among Singh and any customer or investor whose funds and/or assets were received by Singh as a result of the acts and practices that constituted violations of the Act, as described herein;

F.     An order requiring Singh to make full restitution by making whole each and every customer or investor whose funds and/or assets were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.     An order directing Singh to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, Title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act, as described herein;

H.     An order requiring Singh to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.     Such other and further relief as the Court deems proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff CFTC hereby demands a jury trial.


Dated:  February 28, 2023                    Commodity Futures Trading Commission

                                                        By its attorneys:

                                                        */s/ Nina Ruvinsky*
                                                        Nina Ruvinsky (*Pro Hac Vice pending*)
                                                        Senior Trial Attorney
                                                        *nruvinsky@cftc.gov*

                                                        Carlin Metzger (*Pro Hac Vice pending*)
                                                        Senior Trial Attorney
                                                        *cmetzger@cftc.gov*

Elizabeth N. Pendleton (*Pro Hac Vice pending*)
Chief Trial Attorney
*ependleton@cftc.gov*

Robert T. Howell (*Pro Hac Vice pending*)
Deputy Director
*rhowell@cftc.gov*

Scott R. Williamson (*Pro Hac Vice forthcoming*)
Deputy Regional Counsel
*swilliamson@cftc.gov*

Commodity Futures Trading Commission
Ralph Metcalfe Federal Office Building
77 W. Jackson, Suite 800
Chicago, Illinois 60604
(312) 596-0700
(312) 596-0714 (fax)

John C. Murphy *(Local Counsel)*
Trial Attorney
*jmurphy@cftc.gov*
290 Broadway, 6th Floor
New York, NY 10007
646-746-9700
646-746-9888 (fax)

*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*